AO 91 (REV.5/85) Criminal Complaint    AUSA Manish S. Shah (312) 353-0517

FILED
JAN 2 6 2005
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

MICHAEL J. ACOSTA

**CRIMINAL COMPLAINT**

**UNDER SEAL**

CASE NUMBER **05CR0076**

MAGISTRATE JUDGE DENLOW

I, Ralph Renno, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief. On or about October 6, 2004, in Cook County, in the Northern District of Illinois defendant,

did knowingly and willfully make materially false, fictitious and fraudulent statements and representations, in a matter within the jurisdiction of the Federal Bureau of Investigation, an agency within the executive branch of the Government of the United States;

in violation of Title 18 United States Code, Section 1001(a)(2).

I further state that I am a Special Agent of the Federal Bureau of Investigation and that this complaint is based on the following facts:

**See attached affidavit**

Continued on the attached sheet and made a part hereof: X Yes ___ No.

Ralph Renno
Signature of Complainant

Sworn to before me and subscribed in my presence,

January 26, 2005 at Chicago, Illinois
Date    City and State

MORTON DENLOW, U.S. MAGISTRATE JUDGE
Name & Title of Judicial Officer

Morton Denlow
Signature of Judicial Officer

STATE OF ILLINOIS )
) SS
COUNTY OF COOK )

AFFIDAVIT

I, Ralph Renno, being duly sworn, state as follows:

**Introduction**

1. I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been so employed for approximately 12 years. The FBI is an agency located within the executive branch of the United States government. I am currently assigned to the North Resident Agency of the Chicago Division of the FBI. In connection with my official duties, I have investigated violations of federal criminal law, and have received training and have participated in all of the normal methods of investigation, including, but not limited to, visual and electronic surveillance, the general questioning of witnesses, the use of informants, and undercover operations.

2. This Affidavit is made in support of a criminal complaint charging MICHAEL J. ACOSTA with a violation of 18 U.S.C. § 1001(a)(2), charging that ACOSTA did knowingly and willfully make materially false, fictitious and fraudulent statements and representations in a matter within the jurisdiction of the FBI, an agency within the executive branch of the Government of the United States.

3. The information contained in this Affidavit is based on my personal observations and experience in addition to information obtained from other law enforcement agents, witnesses, agent reports, documents, and my review of recorded conversations.

4. Since this Affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe ACOSTA committed a violation of 18 U.S.C. § 1001. Where statements of others are set forth in this Affidavit, they are set forth in substance and in part and are not verbatim. All dates and times set forth below are approximate. Statements from recorded conversations do not include all statements or topics covered during the course of the recorded conversations, and are not taken from a final transcript.

5. As set forth in more detail below, during the course of an FBI and federal grand jury investigation, agents learned of a relationship between John Boyle and Chicago Police Commander MICHAEL J. ACOSTA. The investigation developed evidence that John Boyle requested and received favors from Commander ACOSTA, including the receipt of criminal history information from law enforcement databases. On October 6, 2004, FBI agents interviewed ACOSTA at ACOSTA's office at the Chicago O'Hare Police Station. After being informed that the FBI was investigating Boyle and the favors Boyle requested, ACOSTA falsely denied recalling any favors for Boyle, and specifically denied ever providing Boyle or anyone else with criminal history information.

## The FBI's Investigation of John Boyle and Commander Acosta

6. At times material to this Complaint, the FBI, the Special August 2003-2 Grand Jury, and other federal law enforcement agencies were investigating the City of Chicago's Hired Truck Program and John Boyle, an individual who had previously been convicted of a felony, and sentenced to approximately 38 months in the custody of the U.S. Bureau of Prisons. The federal investigation initially developed evidence of Boyle's commission of mail fraud, bribery, obstruction of justice and racketeering related to the awarding of City truck business to certain companies participating in the Hired Truck Program.

7. On April 9, 2004, Chief Judge Charles P. Kocoras signed an order authorizing, for a period of thirty days, the interception of wire communications to and from a cellular telephone ("Target Telephone 1") subscribed to by Boyle. Interceptions pursuant to that order began on April 12, 2004, at approximately 12:30 p.m. Pursuant to subsequent court orders, interceptions over Target Telephone 1 continued from April 12, 2004 through August 6, 2004.

8. Agents first intercepted a telephone call between ACOSTA and Boyle on April 12, 2004 at 9:27 p.m. From that date through August 3, 2004 (the last date of intercepted contact), agents intercepted at least 44 contacts between Boyle and ACOSTA's telephones. In addition, according to telephone records of contacts between Boyle and ACOSTA's cellular telephones, there were at least 12 contacts from March 10, 2004 through April 11, 2004, and at least 6 contacts from August 11, 2004 through September 11, 2004.

9. Pursuant to the Rules and Regulations of the Police Department, City of Chicago, Rule 41 prohibits police personnel from "disseminating, releasing, altering, defacing or removing any Department record or information concerning police matters except as provided by Department orders." Rule 47 prohibits police personnel from "associating or fraternizing with any person known to have been convicted of any felony or misdemeanor, either State or Federal, excluding traffic and municipal ordinance violations."

10. Based on the intercepted conversations, some of which are set forth below, the FBI began investigating Boyle's relationship with ACOSTA. ACOSTA holds the rank of Commander within the Chicago Police Department, with command over both airports in Chicago, O'Hare and Midway. In this position, ACOSTA has over 100 officers under his command and is the highest ranking officer at the airports.

11. The following matters, among others, were material to the FBI's and the Special August 2003-2 Grand Jury's investigation concerning John Boyle and ACOSTA:

(a) the nature and scope of Boyle's relationship to ACOSTA, including any social and financial relationships between the two;

(b) whether Boyle requested favors of ACOSTA, including whether any requests related to ACOSTA's position with law enforcement;

(c) whether ACOSTA took any actions in response to any requests made by Boyle, including whether ACOSTA used his position with law enforcement to provide information or assistance to Boyle.

(d) whether ACOSTA otherwise took official action for private benefit in a manner inconsistent with his duty of honest services to the City of Chicago.

**Commander Acosta Provides Criminal History Information to Boyle**

12. During the investigation of Boyle, agents identified an individual (Individual B) who was a masonry contractor and spoke to Boyle about construction projects.

13. On April 13, 2004, at 4:46 p.m., (Session 172), in a conversation intercepted over Target Telephone 1, Individual B said to Boyle, "I know you know a couple of those guys downtown, those judge dudes. Listen, there's a buddy of mine working for me here. . . . He got deported, got in a bit of a scuffle one time. . . . They said he was supposed to show up like a month later to be [] thrown out of the country or whatever. . . . Now, he's had parking tickets, speeding tickets, showed up to court and all this junk since, they never came looking for him at his house, they never did anything. I mean is there a chance that he's not or is it just a [] slip up in the system? Or what's going on there? Does anyone know?" Boyle said, "I'm at [a bar] with the Commander [ACOSTA]. Why don't you stop by?"

14. I have spoken with the owner of the bar referenced in ¶13 above. The bar owner confirmed that on April 13, 2004, Boyle and ACOSTA were present at the bar. The bar owner did not recall whether Individual B was present that same evening.[1]

---

[1] The bar owner explained that on April 13, 2004, ACOSTA came to the bar in order to receive a $2000 check the owner wrote as a donation to a Chicago Police benefit. Boyle introduced ACOSTA to the bar owner, and the bar owner gave ACOSTA the $2000 check. After receiving the check, ACOSTA gave his business card to the bar owner. On the back of the card, ACOSTA wrote his pager number. ACOSTA said to the bar owner words to the effect of, "If you ever need anything, give me a call."

(continued...)

15. According to Individual B, in April 2004, he employed a man who, because of a prior arrest, was subject to deportation and removal, but had remained in the United States illegally. The employee was afraid of being deported, and Individual B stated that he explained the situation to Boyle. Boyle said that for $5,000, he could have the employee's criminal record expunged. Individual B stated that the employee agreed to pay $5,000 to have the record expunged.

16. On April 14, 2004, at 9:29 a.m., (Session 218), in a conversation intercepted over Target Telephone 1, Boyle called ACOSTA. ACOSTA answered, "Hello?" Boyle said, "Hi buddy." ACOSTA said, "Yes?" Boyle asked, "What about that kid [Individual B's employee]?" ACOSTA said "I'm working on that right now. This son of a bitch got all kinds of goddamn problems, doesn't he?" ACOSTA related that "the kid" had been arrested for burglary, battery, resisting arrest and trespassing in the last couple of years. ACOSTA said he would call Boyle back as soon as "I get the rest of this stuff."

17. On April 14, 2004, at 9:51 a.m., (Session 222), in a conversation intercepted over Target Telephone 1, ACOSTA called Boyle. Boyle answered the phone, "Hello?" ACOSTA immediately said, "This kid's from Poland." Boyle said, "Huh?" ACOSTA said, "This kid's from Poland." Boyle said, "Hello?" ACOSTA said, "Yeah. It's me." Boyle

---

[1](...continued)

On October 8, 2004, federal agents arrested Nick LoCoco pursuant to a criminal complaint. Among LoCoco's personal effects at the time of his arrest were two business cards for ACOSTA. Handwritten on the back of one business card was ACOSTA's cellular telephone number. Handwritten on the back of the other business card was: "Please call me if I can help this individual, good friend," signed Commander M J ACOSTA and followed by a pager number.

said, "Yeah, Mike?" ACOSTA later said, "He's a little jagoff, or he was a jagoff. . . . It's all taken care of, he's got no warrants, no nothing, he's all set. Good to go." Boyle asked, "He's got nothing pending?" ACOSTA said, "No." Boyle then said, "Does that include immigration?" ACOSTA replied, "No." ACOSTA said to Boyle, "This guy's got two felony arrests, 7 arrests all together." ACOSTA added that two arrests were for felonies, two for misdemeanors and a conviction was for misdemeanor battery.

18. On April 14, 2004, at 12:06 p.m., (Session 252), in a conversation intercepted over Target Telephone 1, Boyle called ACOSTA. ACOSTA answered, "Hello?" Boyle said, "Hi buddy." ACOSTA said, "Yeah, what's up?" Boyle said, "Keep that paperwork for me so I can have it expunged. . . what you ran this morning." ACOSTA said that he could only give Boyle "the numbers." Boyle said that he needed "the numbers and what it was for." ACOSTA agreed to provide them and added, "you know he's got juvenile stuff," however, Boyle had disconnected the call.

19. Individual B stated that he ultimately paid Boyle approximately $3500 in cash, on behalf of his employee in order to have Boyle arrange for the expungement of the employee's criminal record. According to my review of criminal history records, no expungement of the employee's record occurred.

20. According to records of the Chicago Police Department computerized criminal history database (CHRIS), on April 13, 2004, at approximately 9:35 a.m., a Chicago Police Officer assigned to O'Hare (Officer A) accessed CHRIS and obtained the "Arrestee History"

of Individual B's employee. At approximately 9:36 a.m., Officer A accessed CHRIS and obtained the "Rap Sheet" of Individual B's employee.

21. Officer A was interviewed by agents in December 2004 and stated that he/she recalled obtaining criminal history information at Commander ACOSTA's direction on only two occasions over an approximate one year period. Officer A did not recall specific details concerning the individuals about whom ACOSTA directed criminal history checks, but did recall that one person was a male in his early twenties who had arrests when he was young. Based on my review of documents, Officer A's description is consistent with Individual B's employee.

**Other Requests and Favors Between Boyle and Acosta**

22. On April 30, 2004, at 4:10 p.m. (Session 1319), in a conversation intercepted over Target Telephone 1, Boyle asked ACOSTA about a bar at an address in Chicago, and wanted to know why the bar had been shut down by the police. Boyle said that he was trying to get a new liquor license for the establishment, and wanted to know what happened previously at that location. Boyle asked ACOSTA for the name of the Commander of the district where the bar was located. Boyle asked ACOSTA, "Is he ours?" ACOSTA said, "No." Boyle said, "When you go in there on Monday, get me all the paper you can on that location, from the drug unit and what you had in [the District]. . . so I know what I'm going against when I go to City Hall." Boyle said, "With the new guy in there, I want to know

more than he does." ACOSTA said, "Okay." At the end of the call, Boyle said, "Alright, thank you sir, let me know on Monday. You're the best."

23. On July 7, 2004 at 5:24 p.m. (Session 6530), in a call intercepted over Target Telephone 1, ACOSTA said to Boyle, "Where you at now? How long am I going to wait for you?" Boyle gave ACOSTA his location and said that he had just purchased property on which he intended to build 48 townhomes. ACOSTA said, "Oh good. You going to sell me one of those townhomes for my boy? [. . .] I need one for each of them, is what I really need." Later, Boyle said, "You always call me with problems. . . you never come drink with me, 'cause you don't love me no more." ACOSTA said, "Who answered all those calls when you were in prison? Who was always there to answer them calls, huh?" Boyle said, "That's not my point. Who, when I came out, doesn't drink with me no more?" ACOSTA said, "Oh yeah, right." ACOSTA then gave directions to Boyle to get to ACOSTA's house from Boyle's location.

24. On July 8, 2004, at 7:28 p.m. (Session 6654), in a call intercepted over Target Telephone 1, Boyle asked ACOSTA how to get a car out of a short term parking lot at the airport. ACOSTA asked, "What's wrong with it?" Boyle said, "I don't want to pay the $300." ACOSTA chuckled, "Oh, good." Boyle said, "You know why I don't want to pay $300? Because I want to take $300 off my concrete bill . . . for your daughter's [] concrete." Boyle said, "Have [Officer B] call me, and I'll explain it . . . and we'll handle it. I'm over here now, to take care of your situation that you need about the house. . . ." ACOSTA asked

why "can't somebody just drive it out of there." Boyle said, "They could drive it out, but they gotta pay 300 bucks." ACOSTA said, "Not if they got a ticket that says they were only there for an hour." Boyle said, "You have [Officer B] give me that, and I'll take care of it." ACOSTA said that he would have Officer B call Boyle because "I don't know how to do that."

25. On July 8, 2004, at 7:28 p.m. (Session 6655), in a call intercepted over Target Telephone 1, ACOSTA told Boyle, "[Officer B] is gonna call you right now. [Officer B]'s with your brother. . ."

26. On July 8, 2004, at 7:55 p.m. (Session 6660), in a call intercepted over Target Telephone 1, Boyle spoke to Officer B. Boyle explained the situation of an acquaintance whose car was parked at O'Hare airport and had been charged $300 to get the car out of the lot. Officer B agreed to help the acquaintance, Individual C, the next morning.

27. In the morning of July 9, 2004, in a series of calls intercepted over Target Telephone 1, Boyle directed Individual C to the Chicago O'Hare Police Station.

28. Individual C was interviewed by agents in October 2004. Individual C stated that a car belonging to a relative had been parked at a parking lot at O'Hare. In attempting to retrieve the car from the parking lot, Individual C recalled that the person at the parking lot gate wanted $200. Because Individual C did not have the money, he returned the car to its parking spot. That evening, Individual C saw Boyle at a bar, and explained the parking problem to him. Individual C recalled that some time later, Boyle told him that he could go

to O'Hare and get his car out of the lot. Individual C followed Boyle's directions to an O'Hare police building and met with a person he did not know. This person took Individual C to his car, and Individual C was able to drive the car out of the parking lot without paying any money to anyone.

29. In December 2004, agents spoke to Officer B, a Chicago Police Officer assigned to Chicago O'Hare, under the command of ACOSTA. Officer B stated that he/she recalled doing a favor concerning a parked car several months earlier in 2004 at ACOSTA's request. ACOSTA called Officer B and told Officer B that a friend of Boyle left a car at an O'Hare parking lot and told Officer B to call Boyle. Officer B recalled speaking to Boyle and agreeing to help Boyle's friend. The next day, Officer B met Boyle's friend at the O'Hare Police station. Officer B contacted an individual at the management company for the parking lot and said that a friend of Commander ACOSTA needed to have a car released from the parking lot. Officer B stated that the parking lot attendant opened the gate and allowed the car to be driven out of the lot without paying any fees.

30. On July 9, 2004, at 11:40 a.m. (Session 6686), in a call intercepted over Target Telephone 1, Individual C told Individual A, "You're a good man." Boyle gave Individual C a telephone number and said, "That's Commander ACOSTA at the airport. You call him and thank him for today. . . . You call the Commander to thank him for what just happened. That's who took care of you."

31. On July 9, 2004, at 11:45 a.m. (Session 6688), in a call intercepted over Target Telephone 1, Individual C told Boyle, "I thanked him for getting the car out."

32. Officer B explained to federal agents that after ACOSTA became the Commander at the airport, Officer B would sometimes get calls from ACOSTA regarding favors for Boyle. Officer B recalled that in December 2003 or January 2004, ACOSTA called Officer B and told the officer that Boyle had excess baggage weight and ACOSTA wanted Officer B to call the airline to get the excess baggage fee waived. Officer B stated that he/she contacted the airline and told an airline representative that Boyle was a friend of Commander ACOSTA and asked that the fee be waived. The airline agreed to waive the fee.

**Acosta's False Statements to FBI Agents**

33. On October 6, 2004, FBI agents interviewed ACOSTA at his office at the Chicago O'Hare Police station. The agents told ACOSTA that they were investigating Boyle, and that the investigation was coming to a head.[2] The agents told ACOSTA that they were aware that Boyle had made a donation to a CPD benefit, and were interested in finding out when Boyle would ask for or give favors to people. ACOSTA voluntarily agreed to speak to agents about his relationship with Boyle.

**1. Acosta Denied Providing Criminal History Information to Boyle**

34. During the interview, agents asked ACOSTA if Boyle ever asked for someone's arrest record. ACOSTA stated, never. Later in the interview, agents asked again

[2] Boyle had been arrested on the morning of October 6, 2004, pursuant to a criminal complaint.

if Boyle ever asked for a criminal history. ACOSTA answered, no, and added that he would not give that to anyone.

35. As set forth in ¶¶ 16-18 above, Boyle did ask ACOSTA for criminal history information, and ACOSTA provided criminal history information to Boyle.

**2. Acosta Provided Misleading Information About His Relationship With Boyle**

36. In the interview, ACOSTA stated that he had known Boyle for a long time, and that he was a nice guy. ACOSTA said that he had attended the funeral of Boyle's brother in the 1990s. ACOSTA stated that he knew Boyle was employed by the City, but ACOSTA did not know what Boyle did for the City. ACOSTA said that he did not know Boyle's other brother. ACOSTA said that he knew Boyle had some legal trouble in the past but was not sure of the specifics, and never fully understood how Boyle received the nickname "Quarters." ACOSTA stated that he enjoyed reading articles in the *Chicago Tribune* about Boyle.

37. ACOSTA stated that he and Boyle have met to have drinks together a couple of times within the past ten years. When asked how often that ACOSTA talks to Boyle, ACOSTA answered that it depends on if ACOSTA is selling any fundraising tickets or if other events such as CPD funerals occur. When asked when the last time was that ACOSTA spoke to Boyle, ACOSTA stated that it could have been anywhere between two weeks to two months earlier. ACOSTA could not remember the context of the conversation and stated that as such, it could not have been important.

38. As set forth in ¶¶ 8, 16-18, and 22-25 above, ACOSTA had been intercepted in many telephone calls with Boyle in a four month period, including conversations that were not related to charitable fundraising by ACOSTA. In one such conversation, ACOSTA acknowledged repeatedly speaking to Boyle when he was in prison.

**3. Acosta Denied Knowledge of Boyle's Real Estate Investments**

39. ACOSTA further told agents that Boyle never told ACOSTA about real estate investments and that ACOSTA did not know any specific properties that Boyle invested in or wanted to invest in. When asked if Boyle had talked to ACOSTA within the past few months about anything that Boyle was investing in, ACOSTA stated that there were no investments that he could think of that Boyle had talked to him about during that time.

40. As set forth in ¶ 23 above, Boyle told ACOSTA about a property development in July 2004, and ACOSTA inquired about purchasing townhomes for his children.

**4. Acosta Denied Recalling Any Favors Related to His Position in Law Enforcement**

41. Agents asked ACOSTA if he could recall any favors that Boyle ever asked for, and ACOSTA stated that he could not think of any that would have related to ACOSTA's position in law enforcement. ACOSTA stated that the only thing that Boyle would have asked him about would be why someone was in jail, which ACOSTA would tell him. ACOSTA said he could not recall any specific individual for whom Boyle asked about being in jail.

42. As set forth in ¶¶ 16-18 and 22-25 above, during a four month period of wire interceptions, Boyle asked ACOSTA for several favors related to ACOSTA's position in law enforcement. These favors included a request for criminal history information, a request for information from police files related to a bar closure, and a request to release a car from an O'Hare parking lot without paying fees. Moreover, Officer B told agents of a request from ACOSTA to have Boyle's excess baggage fee waived. None of these requests related to Boyle asking ACOSTA why a person was in jail.

**Conclusion**

43. Based on the foregoing, I submit that there is probable cause to believe that on or about October 6, 2004, MICHAEL J. ACOSTA did knowingly and willfully make materially false, fictitious and fraudulent statements and representations, in a matter within the jurisdiction of the Federal Bureau of Investigation, an agency within the executive branch of the Government of the United States, when ACOSTA stated that: (a) Boyle never asked ACOSTA for any person's arrest record and criminal history information; (b) ACOSTA would not provide Boyle or anyone else with criminal history information; and (c) ACOSTA could not recall any favors requested by Boyle that related to ACOSTA's position in law enforcement; in violation of 18 U.S.C. § 1001(a)(2).

FURTHER AFFIANT SAYETH NOT.

Ralph Renno
Special Agent
Federal Bureau of Investigation

SUBSCRIBED AND SWORN TO BEFORE ME
This 26th day of January 2005

MORTON DENLOW
United States Magistrate Judge